IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Newport News Division*

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 4:24-cr-1 |
| ) | |
| HEZEKIAH JANILE CARNEY, ) | |
| a/k/a "H.K." ) | |
| ) | |
| Defendant. ) | |

SENTENCING POSITION OF THE UNITED STATES

In accordance with 18 U.S.C. § 3553(a) and the United States Sentencing Commission, *Guidelines Manual*, § 6A1.2 (the "Guidelines"), the United States of America, through its attorneys, Jessica D. Aber, United States Attorney for the Eastern District of Virginia, and undersigned counsel, hereby represents that it has reviewed the probation office's presentence report (hereinafter "PSR") and does not dispute any of the facts set forth therein. For the reasons to follow, and the reasons to be offered during the sentencing hearing, the United States respectfully requests that the Court impose a sentence of 45 years of imprisonment.

The defendant was the leader of a regional set of a violent street gang, the Black P. Stone Nation ("BPSN"), with lines in at least three states. His female counterpart in the gang, T.M., stopped being responsive and otherwise following the rules. This was not allowed. The defendant and his group could not countenance the disrespect. The defendant found T.M. in violation and ordered a beating. Troublingly, this was not the first time he ordered the group to beat a member for breaking the rules. After the beating, the defendant became aware of text messages that suggested T.M. was laughing at the group. He and four gang members returned to her residence in Richmond and abducted her in the middle of the night. The group taunted and

1

beat T.M. repeatedly as they drove her to a remote area of York County, Virginia. Two shooters ordered T.M. out of the vehicle on a remote road and directed her to walk into the woods. As the leader, the defendant approved of and allowed the murder to occur in the manner and place in which it happened. The shooters fired fourteen times while the defendant stood near the rear of the vehicle on his phone, seemingly unbothered by what was transpiring. A sentence of 45 years of imprisonment is the absolute minimum to reflect the seriousness of the offense, the history and characteristics of the defendant, afford adequate deterrence, and protect the public.

## PROCEDURAL HISTORY

On December 18, 2023, a Criminal Complaint was filed against ACACIA IYANA JACKSON, a/k/a "Dominant," and DONNISHA TYVETTE GOODMAN, a/k/a "Lady Henny," charging them with conspiracy to commit kidnapping and kidnapping resulting in death. ECF No. 1. On January 16, 2024, a federal grand jury sitting in the Newport News Division of the Eastern Division of Virginia returned a two-count Indictment against JACKSON and GOODMAN, charging each defendant with conspiracy to commit kidnapping, in violation of 18 U.S.C. § 1201(c) and kidnapping resulting in death, in violation of 18 U.S.C. § 1201(a)(1) and 2. ECF No. 24.

JACKSON was the first defendant to plead guilty. On March 5, 2024, JACKSON pleaded guilty to conspiracy to commit kidnapping. ECF No. 35.

On April 10, 2024, defendant CARNEY was named in a Superseding Indictment, which brought the same charges and added defendant CARNEY, JAYQUAN ALLEN JONES, a/k/a "Dolo," and JAMICA DANIELLE LANGLEY, a/k/a "Ja'Mica Langley" and "Baby D." ECF No. 40.

LANGLEY was the second defendant to plead guilty. On July 2, 2024, LANGLEY

pleaded guilty to conspiracy to commit kidnapping.   ECF No. 80.

On July 8, 2024, a federal grand jury sitting in the Newport News Division of the Eastern District of Virginia returned a Second Superseding Indictment, additionally charging defendant CARNEY, JONES, and GOODMAN with murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1) and 2 and use of a firearm causing death, in violation of 18 U.S.C. § 924(j)(1) and 2. ECF No. 85.

GOODMAN pleaded guilty to use of a firearm causing death on August 19, 2024. ECF No. 99. JONES similarly pleaded guilty to use of a firearm causing death on August 27, 2024. ECF No. 103.   On August 29, 2024, CARNEY appeared before this Court and pled guilty to use of a firearm causing death.   ECF No. 107.   He was the last defendant to plead guilty.

Pursuant to the terms of the defendant's plea agreement, the Court must sentence the defendant to a term of imprisonment between 35 and 45 years.   With the addition of a four-level enhancement for leadership, which the parties agree should be applied, he faces an offense level of 46 and an advisory guideline range of life.   PSR ¶ 103.

## OFFENSE OF CONVICTION

The defendant was the "Krown Prinxe" for a regional area of BPSN, a violent criminal street gang with various regional subsets across the United States.   ECF No. 109 ("SOF") ¶ 1. The BPSN was a structured criminal enterprise with its own set of rules and hierarchies.   SOF ¶¶ 6-7.   Members of the BPSN were expected to enrich themselves and their fellow members through, among other things, narcotics distribution, firearms trafficking, and robberies.   SOF ¶ 7, 13.   They also engaged in intimidation, threats of violence, and violence to protect and enhance their position of power in the community.   SOF ¶ 7.

As a Krown Prinxe, the defendant was the highest-ranking leader of the Vietnam Blakk

Stone Gorillas, a set of BPSN with lines in Virginia, North Carolina, and New York.  SOF ¶ 4. The defendant answered to the Chairman of the BPSN pyramid or branch of which the Vietnam Blakk Stone Gorillas were part.  SOF ¶ 4.

Approximately one month before the instant offense, the defendant, GOODMAN, and LANGLEY performed a "violation" or a physical beating, of another BPSN member for violating gang rules, causing serious bodily injury.  PSR ¶ 12.  This demonstrates a troubling pattern of gang-related beatings and violence leading up to the murder constituting the offense of conviction.

T.M. was the "Krown Prinxess" of a BPSN set in Virginia and was the highest-ranking female member for her geographic area.  SOF ¶¶ 4, 14.  Her male-equivalent in the BPSN hierarchy was the "Krown Prinxe," a position held by the defendant.  SOF ¶ 4.

In the days leading up to May 6, 2023, the defendant, JACKSON, GOODMAN, and LANGLEY determined that T.M. committed a gang infraction warranting a physical beating. SOF ¶ 17.  Notably, the defendant agreed that he had the ultimate authority to conclude that a member's conduct constituted a violation warranting punishment.  *Id*.

On the evening of May 4, the defendant, JACKSON, CARNEY, and LANGLEY drove to the Hampton Roads area to Richmond to beat T.M.  SOF ¶ 18.  However, they got a flat tire on their drive, which delayed their arrival in Richmond until the early morning hours of May 6, 2023. SOF ¶ 19.

On May 4, 2023, JACKSON texted T.M. that they were on their way to see her, and later notified T.M. about the flat tire.  SOF ¶ 20.  T.M. asked why they were coming over "out of the blue."  SOF ¶ 20.  At 1:15 a.m. on May 5, 2024, JACKSON texted T.M. "Yoooooo," and T.M. replied, "You n[******] was supposed to dub [beat] me last night 😂."  SOF ¶ 20.

When the defendant, GOODMAN, JACKSON, and LANGLEY arrived at T.M.'s

4

residence just after 1:00 a.m. on May 6, 2024, they notified T.M. of her violation and the defendant supervised and kept time while GOODMAN, JACKSON, and LANGLEY beat T.M. with closed fists for a specified period of time, resulting in bruises to T.M.'s face and body. SOF ¶ 22.

Next, GOODMAN drove JACKSON, CARNEY, and LANGLEY in her vehicle from T.M.'s residence to JONES' residence nearby. SOF ¶ 23. There, the defendant, JONES, GOODMAN, LANGLEY, and JACKSON sat in the defendant's vehicle and played music on JACKSON's cell phone. GOODMAN picked up JACKSON's phone to play music and saw the aforementioned text messages between JACKSON and T.M. SOF ¶ 24. Despite that the conversation occurred before T.M.'s beating, GOODMAN interpreted the text message as a sign of disrespect, and sent a screenshot of the message to the defendant. SOF ¶ 24. After reviewing the disrespectful message, the defendant remarked, "that b[****] is going to be beat out." PSR ¶ 12. At this point, the group decided to return to T.M.'s residence. SOF ¶ 25.

The defendant, GOODMAN, JONES, LANGLEY, and JACKSON returned to T.M.'s residence in the GOODMAN's vehicle. SOF ¶ 25. They walked to the front door, where they could hear T.M. speaking with her boyfriend. SOF ¶ 26. They knocked, and when T.M. opened the door, GOODMAN and LANGLEY started to beat T.M. SOF ¶ 26. The defendant and JONES brandished their firearms and chased T.M.'s boyfriend upstairs, where the boyfriend locked himself in a bedroom and jumped out of a window to escape. SOF ¶ 26. After the boyfriend's escape, LANGLEY and GOODMAN, who was armed, walked T.M. to the defendant's car, while the defendant and JONES also brandished their firearms. SOF ¶ 27.

The defendant began driving eastbound on Interstate-64. After approximately an hour of driving, the defendant and his co-defendants stopped at a 7-Eleven in Newport News. SOF ¶ 30. While JONES and LANGLEY went into the store, GOODMAN forced T.M. to suck on the barrel

5

of her firearm and pistol whipped T.M. in the face.   SOF ¶ 30.

JONES and LANGLEY got back in the vehicle and GOODMAN started driving again. GOODMAN stopped her vehicle in the roadway of Old Williamsburg Road in York County, Virginia.   GOODMAN and JONES had T.M. get out of the car and walk into the woods, where the defendant and JONES shot and killed her, firing at least fourteen shots and striking T.M. eight times in the head, abdomen, back, buttocks and legs.   SOF ¶ 31-32.

## THE VICTIM

At the time she was murdered, T.M. was twenty-five years old.   She was the mother of two minor children.   Her mother provided the Court with a more personal description of her daughter:

> [T.M.] was not just my daughter, she was my first true love.   She was my twin. She was a vibrant soul, her smile could light up a room.   I struggled for months after her death to even look in the mirror because she looked so much like me.

In her victim impact statement, T.M.'s mother further described the devastating harm to T.M's family from the murder.

> My youngest daughter became distraught, started acting like [T.M.], she started running away, getting arrested, and I had to reach out to the courts for help.

> My children have lost their sense of safety and security in the community and with some family and friends.   My children have become overly protective of one another and are very cautious when it comes to anyone else.   They struggle with the feeling of grief, express it with anger and withdrawing from loved ones.   This crime has altered their perception of safety and hurt her [two] daughters who are only 5-6 years old have yet to fully understand [T.M.] is not coming back.

T.M. was murdered on May 6, 2023, in York County, but she was certainly not the only person harmed by this senseless crime.

## THE DEFENDANT'S BACKGROUND

The defendant is a twenty-six-year-old male from Norfolk, Virginia. PSR at 2, ¶ 51. He was born to a non-marital union. His father is incarcerated and presently serving consecutive sentences for three malicious shootings at occupied vehicles. PSR ¶ 51. His father also has a prior felony drug conviction for possession with intent to distribute heroin. PSR ¶ 51. The defendant's mother is a certified nursing assistant. PSR ¶ 52. According to the defendant, his mother has an addiction to alcohol, cocaine, and heroin. PSR ¶ 52.

Because his father was in and out of prison, the defendant was primarily raised by his mother and a stepfather, A.B. PSR ¶ 52. The defendant had a difficult childhood marred with abuse, neglect, and violence. PSR ¶ 54. He had inadequate amounts food, unstable shelter, and a lack of clothing. *Id*. He witnessed troubling physical abuse of his mother by his father. *Id*. The defendant was also sexually abused at age 8 or 9 by a family friend. *Id*. The defendant later moved in with his godparents for a period of years. PSR ¶ 55.

Due to his lack of love and support, the defendant joined gangs at the age of 12 or 13. PSR ¶ 57. He first joined the Mad Stone Bloods. *Id*. Later, he changed affiliation to the BPSN. *Id*.

The defendant is married and has two children with two other women. PSR ¶ 62-63. His son is approximately one year old and lives with his mother in Norfolk. PSR ¶ 64. He also has a daughter with codefendant GOODMAN who was born shortly after the two were arrested on the instant case. PSR ¶ 65.

The defendant reported that his overall health is fair. PSR ¶ 70. He does not take any medications. PSR ¶ 70. He has lingering pain in his right hip and left arm from two different instances when he was shot. PSR ¶ 71-72. The defendant has mental health issues, including

post-traumatic stress disorder from being shot and witnessing gun violence as a young child. PSR ¶ 74. He also suffers from nightmares and was prescribed medication to help him sleep at Portsmouth City Jail. PSR ¶ 76.

The defendant reported a lengthy history of substance abuse. PSR ¶ 78. The defendant has a history of abusing alcohol, marijuana, cocaine, heroin, methamphetamines, and prescription drugs like Xanax and Percocet. *Id*.

The defendant dropped out of high school in Norfolk and later graduated from a program in Kentucky. PSR ¶ 79. As a young adult, he has a lengthy criminal record of violence and drug offenses. In January 2020, he was convicted of two state felonies for shooting in commission of a felony and malicious discharge of a firearm at occupied dwelling. PSR ¶ 34. According to the PSR, the defendant got into an argument and fired a handgun into a residence where three children were at the time. PSR ¶ 34. He did not complete any programs while incarcerated. *Id*.

On May 10, 2023, the defendant was arrested with a firearm and cocaine packaged for distribution. PSR ¶ 38. Specifically, he was found in possession of a loaded Sig Sauer Model P365 handgun and eighteen knotted bags of cocaine. *Id*. He was charged federally, pleaded guilty, and was sentenced to 54 months on April 13, 2024. *Id*.

The PSR also details approximately seven other arrests. PSR ¶ 44-50. These are for troubling charges like malicious shootings, attempted malicious wounding, attempted robbery, robbery, drug trafficking, and possessing firearms in connection with drug trafficking. *Id*. Although a sentencing court may not consider a bare arrest record, a number of the charges reference specific (and similar) acts of assault from court and police records may be considered if

determined reliable. U.S.S.G § 4A1.3(a)(2)(E); *United States v. Harris*, 702 F.3d 226, 229-231 (5th Cir. 2012). It does not appear that the defendant denies any of this conduct.

## POSITION ON SENTENCING AND ARGUMENT

The United States respectfully submits that a sentence of 45 years of imprisonment is appropriate in light of all of the sentencing factors set forth in 18 U.S.C. § 3553(a) and would be sufficient but not greater than necessary to accomplish the goals of sentencing.

*First*, with respect to the first statutory sentencing factor, the nature and circumstances of this offense are some of the most severe that can occur in the federal criminal system. The defendant was the leader of a violent set of a national street gang. He led his followers to shoot and kill T.M., a twenty-five-year-old mother of two young children. Not only did the defendant orchestrate the taking of a human life, he oversaw the beating and taunting of T.M. in the hours leading up to her death. After beating the victim the first time, the defendant and his codefendants chose to return to T.M.'s residence and escalate their violence over what can only be described as extremely trivial perceived disrespect. Upon their return, they created such an environment of fear that T.M.'s boyfriend jumped out of a second-floor window to escape the group.

The defendant played a particularly egregious role in the kidnapping and murder. He was the leader who determined T.M. had violated the rules of the gang. He had the power to stop the abduction or murder. He used none of this power to intervene. This was not a heat of the moment decision, as the defendant and his coconspirators drove over fifty miles from Richmond to the scene of the murder, with a stop along the way in Newport News. During that stop, rather than make any attempt to deescalate the situation, the defendant allowed GOODMAN to further humiliate and brutalize T.M. by attempting to sodomize her and pistol whipping her in the face.

9

The involvement of a gang in this offense heightens its severity, as the defendant contributed to violence, fear, and instability in his community. BPSN is no minor criminal enterprise; rather, it is one that has promoted murder, robbery, drug trafficking, and other violent offenses. Here, the defendant's choice to take part in the gang life has left a family without a mother, daughter, and granddaughter. Federal law recognizes violent crimes committed on behalf of a criminal enterprise warrant greater punishment, and that should be reflected in the defendant's sentence. *See* 18 U.S.C. § 1959.

*Second*, with respect to the statutory sentencing factor regarding the defendant's history and characteristics as a person, his difficult upbringing is certainly mitigating, but it does not outweigh his history of violence and drug trafficking. As is often the situation in gang cases, the PSR describes an extraordinarily challenging childhood for the defendant, including the absence of his parents, sexual assault, and extreme poverty. However, all of that must be balanced against the defendant's choice to deprive T.M.'s children of their mother, a choice that will negatively impact them for the rest of their lives.

Additionally, the defendant's murder of T.M. cannot be viewed in a vacuum. It must be evaluated in the context of the defendant's escalating acts of violence throughout his adulthood and membership in BPSN. His criminal history reflects convictions for a prior shooting where children were in the line of fire. He also has a felony convictions for illegally possessing a firearm and possessing narcotics with intent to distribute. These are serious crimes that show the defendant is a danger to the community and presents a high risk to reoffend. As noted above, the defendant also had multiple arrests that did not result in convictions for offenses such as malicious shootings, attempted malicious wounding, attempted robbery, robbery, drug trafficking, and possessing firearms in connection with drug trafficking.

As a member of BPSN, the defendant has committed at least one other violent assault prior to the murder that the government is aware of, participating in the beating of another gang member, which resulted in serious physical injury. *See* PSR ¶ 12. Rather than learn from this experience and renounce his membership in the gang, he continued his participation and escalated to committing a murder. For these reasons, the defendant's history and characteristics further support a sentence of 45 years of imprisonment.

*Third,* with respect to the third statutory sentencing factor, a lengthy sentence of incarceration is the only sentence available to the Court. The offense of conviction was an offense level 46, which is at the bottom of Zone D and the top of the Guidelines. His advisory guideline range is life. A probationary or split sentence is not available for such offenses and would be grossly insufficient. U.S.S.G. 5B1.1(b).

*Fourth* and finally, general deterrence, the seriousness of the offense, promoting respect for the law, providing just punishment, and public safety all support a sentence of 45 years. The public must look at the actions of the defendant and know that these offenses will be not tolerated. Considering the dangerous nature of the defendant's crimes, a sentence at the high end of the range the Court may consider is long enough to ensure meaningful deterrence, respect for the law, and serve as a warning to others considering membership in an enterprise like the BPSN of the consequences that may follow.

## REQUEST FOR CONSECUTIVE SENTENCE

The defendant requests that the sentences of 54 months for his drug and firearm convictions in Case No. 4:23-cr-83 run concurrent to any sentence imposed in the instant case. He objects that his 2023 case should be designated a related case to the instant case.

Sentencing judges "have discretion to select whether the sentences they impose will run concurrently or consecutively with respect to other sentences they impose, or that have been imposed in other proceedings." *Setser v. United States*, 566 U.S. 231, 236 (2012). In determining whether to impose a concurrent or consecutive sentence, courts consider U.S.S.G. § 3553(a), they type and length of the prior undischarged sentence, the fact that the prior sentence may have been imposed at a different time before a different federal court, and any other relevant circumstance. *See* U.S.S.G. § 5G1.3 cmt. n.4(A).

Here, the defendant's firearm and drug convictions were entirely separate from the murder of T.M. Legally, it is of no consequence whether the earlier case was designated a related case or not. The Court has discretion to fashion the sentence as consecutive or concurrent after considering the statutory sentencing factors. 18 U.S.C. § 3584 ("The court, in determining whether the terms imposed are to be ordered to run concurrently or consecutively, shall consider, as to each offense for which a term of imprisonment is being imposed, the factors set forth in section 3553(a).). The defendant's possession with intent to distribute eighteen knotted bags of cocaine plainly has nothing to do with T.M. And the firearm was tested and was not used to shoot and kill T.M. To impose a concurrent sentence in this case would provide the defendant an unjustified windfall on his illegal possession with intent to distribute dangerous drugs and illegal possession of a firearm as a convicted felon. A consecutive sentence better serves the goals of deterrence, protecting the community, and promoting respect for the rule of law.

## CONCLUSION

The defendant was the senior BPSN leader who oversaw the murder of T.M. He was not a shooter, but that was not his role as a senior member of the organization. If he had intervened or done anything, he could have stopped these heinous crimes. Instead, he supervised the

violence at every step.   A significant sentence is necessary to account for the seriousness of the crime of conviction.   For the foregoing reasons, the United States respectfully requests that this Court impose a sentence of 45 years of imprisonment, which is sufficient but not greater to accomplish the goals of sentencing.

                Respectfully submitted,

                JESSICA D. ABER
                UNITED STATES ATTORNEY

By:       /s/
Lisa R. McKeel
Assistant United States Attorney
Virginia Bar No. 28652
One City Center
11815 Fountain Way, Suite 200
Newport News, Virginia 23606
(757) 591-4000 Office
(757) 591-0866 Fax
Lisa.McKeel@usdoj.gov

By:       /s/
D. Mack Coleman
Assistant United States Attorney
One City Center
11815 Fountain Way, Suite 200
Newport News, Virginia 23606
(757) 591-4000 Office
(757) 591-0866 Fax
Mack.Coleman@usdoj.gov

By:       /s/
Alyssa Levey-Weinstein
Special Assistant United States Attorney
One City Center
11815 Fountain Way, Suite 200
Newport News, Virginia 23606
(757) 591-4000 Office
(757) 591-0866 Fax
Alyssa.Levey-Weinstein@usdoj.gov

CERTIFICATE OF SERVICE

      I certify that on December 26, 2024, I electronically filed a copy of the foregoing with the Clerk of the Court using the CM/ECF system who will send notification of such filing (NEF) to all counsel of record.

Respectfully submitted,

JESSICA D. ABER
UNITED STATES ATTORNEY

By:     /s/
Lisa R. McKeel
Assistant United States Attorney
Virginia Bar No. 28652
One City Center
11815 Fountain Way, Suite 200
Newport News, Virginia 23606
(757) 591-4000 Office
(757) 591-0866 Fax
Lisa.McKeel@usdoj.gov

By:     /s/
D. Mack Coleman
Assistant United States Attorney
One City Center
11815 Fountain Way, Suite 200
Newport News, Virginia 23606
(757) 591-4000 Office
(757) 591-0866 Fax
Mack.Coleman@usdoj.gov

By:     /s/
Alyssa Levey-Weinstein
Special Assistant United States Attorney
One City Center
11815 Fountain Way, Suite 200
Newport News, Virginia 23606
(757) 591-4000 Office
(757) 591-0866 Fax
Alyssa.Levey-Weinstein@usdoj.gov