IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Newport News Division*

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 4:24-cr-1 |
| ) | |
| DONNISHA TYVETTE GOODMAN, ) | |
| a/k/a "Lady Henny" ) | |
| ) | |
| Defendant. ) | |

SENTENCING POSITION OF THE UNITED STATES

In accordance with 18 U.S.C. § 3553(a) and the United States Sentencing Commission, *Guidelines Manual*, § 6A1.2 (the "Guidelines"), the United States of America, through its attorneys, Jessica D. Aber, United States Attorney for the Eastern District of Virginia, and undersigned counsel, hereby represents that it has reviewed the probation office's presentence report (hereinafter "PSR") and does not dispute any of the facts set forth therein. For the reasons to follow, and the reasons to be offered during the sentencing hearing, the United States respectfully requests that the Court impose a sentence of 45 years of imprisonment.

The defendant was one of two shooters in a heinous gang murder. She and JONES fired fourteen times at another human being, killing T.M. All because of perceived disrespect to their criminal organization, the Black P. Stone Nation. To make matters worse, the alleged disrespect was trivial at best. The murder was not a moment of indiscretion or a one-off mistake. The defendant and her coconspirators drove the victim over an hour east of Richmond to a remote area of York County. During the abduction and travel to the murder scene, the defendant and her coconspirators repeatedly struck the victim. If this were not enough, the defendant required the victim to simulate a sex act with on the barrel of the firearm in the hour before the murder. When

1

the victim did not perform to the defendant's liking, she pistol whipped her with the weapon. The facts of the crime of conviction are unconscionable. A sentence of 45 years of imprisonment is the absolute minimum to reflect the seriousness of the offense, the history and characteristics of the defendant, afford adequate deterrence, and protect the public from further crimes of the defendant.

## PROCEDURAL HISTORY

On December 18, 2023, a Criminal Complaint was filed against the defendant and codefendant ACACIA IYANA JACKSON, a/k/a "Dominant," charging them with Conspiracy to Commit Kidnapping and Kidnapping Resulting in Death. ECF No. 1. On January 16, 2024, a federal grand jury sitting in the Newport News Division of the Eastern Division of Virginia returned a two-count Indictment against the defendant and JACKSON, charging each defendant with conspiracy to commit kidnapping, in violation of 18 U.S.C. § 1201(c) and kidnapping resulting in death, in violation of 18 U.S.C. § 1201(a)(1) and 2. ECF No. 24.

JACKSON was the first defendant to plead guilty. On March 5, 2024, JACKSON pleaded guilty to conspiracy to commit kidnapping. ECF No. 35.

On April 10, 2024, the defendant was named in a Superseding Indictment, which brought the same charges and added codefendants HEZEKIAH JANILE CARNEY, a/k/a "HK," JAYQUAN ALLEN JONES, a/k/a "Dolo," and JAMICA DANIELLE LANGLEY, a/k/a "Ja'Mica Langley" and "Baby D." ECF No. 40.

LANGLEY was the second defendant to plead guilty. On July 2, 2024, LANGLEY pleaded guilty to conspiracy to commit kidnapping. ECF No. 80. On July 8, 2024, a federal grand jury sitting in the Newport News Division of the Eastern District of Virginia returned a Second Superseding Indictment, additionally charging the defendant, JONES, and CARNEY with

2

Murder in Aid of Racketeering, in violation of 18 U.S.C. § 1959(a)(1) and 2 and Use of a Firearm Causing Death, in violation of 18 U.S.C. § 924(j)(1) and 2.   ECF No. 85.

On August 19, 2024, the defendant appeared before this Court and pled guilty to Use of a Firearm Causing Death.   ECF No. 99.   On August 27, 2024, JONES appeared before this Court and pled guilty to use of a firearm causing death.   ECF No. 103.   On August 29, 2024, CARNEY appeared before this Court and pled guilty to use of a firearm causing death.   ECF No. 107.   He was the last defendant to plead guilty.

This Court must sentence the defendant to a term of imprisonment between 35 and 45 years.   She faces an advisory guideline sentence of 324 to 405 months.[1]   PSR ¶ 78.

## OFFENSE OF CONVICTION

The defendant was a "First Lady" for a regional area of Black P. Stone Nation ("BPSN"), a violent criminal street gang with various regional subsets across the United States.   ECF No. 101 ("SOF") ¶ 1.   The BPSN was a structured criminal enterprise with its own set of rules and hierarchies.   SOF ¶¶ 6-7.   Members of the BPSN were expected to enrich themselves and their fellow members through, among other things, narcotics distribution, firearms trafficking, and robberies.   SOF ¶ 7, 13.   They also engaged in intimidation, threats of violence, and violence to protect and enhance their position of power in the community.   SOF ¶ 7.

As a First Lady, the defendant was the highest-ranking female leader for the Hampton Roads area.   SOF ¶ 5.   Along with her male leaders, the defendant was responsible for enforcing the rules of BPSN on subordinate members.   SOF ¶¶ 5, 6.   Approximately one month before the instant offense, the defendant, LANGLEY, CARNEY, and JACKSON performed a "violation" or

---

[1] If the Court applies the two-level enhancement for physical restraint, as discussed below, the defendant's advisory guideline range would be 360 months to life.

3

a physical beating, of another BPSN member for violating gang rules, causing serious bodily injury. PSR ¶ 12. This demonstrates a troubling pattern of gang-related beatings and violence leading up to the murder constituting the offense of conviction.

T.M. was the "Krown Prinxess" of a BPSN set in Virginia and was the highest-ranking female member for her geographic area. SOF ¶¶ 5, 14. Her male-equivalent in the BPSN hierarchy was the "Krown Prinxe," a position held by CARNEY. SOF ¶ 4.

In the days leading up to May 6, 2023, the defendant, JACKSON, CARNEY, and LANGLEY determined that T.M. committed a gang infraction warranting a physical beating. SOF ¶ 17. On the evening of May 4, the defendant, JACKSON, CARNEY, and LANGLEY drove to the Hampton Roads area to Richmond to beat T.M. SOF ¶ 18. However, they got a flat tire on their drive, which delayed their arrival in Richmond until the early morning hours of May 6, 2023. SOF ¶ 19.

On May 4, 2023, JACKSON texted T.M. that they were on their way to see her, and later notified T.M. about the flat tire. SOF ¶ 20. T.M. asked why they were coming over "out of the blue." SOF ¶ 20. At 1:15 a.m. on May 5, 2024, JACKSON texted T.M. "Yoooooo," and T.M. replied, "You n[******] was supposed to dub [beat] me last night 😂." SOF ¶ 20.

When the defendant, CARNEY, JACKSON, and LANGLEY arrived at T.M.'s residence just after 1:00 a.m. on May 6, 2023, they notified T.M. of her violation and CARNEY supervised and kept time while GOODMAN, JACKSON, and LANGLEY beat T.M. with closed fists for a specified period of time, resulting in bruises to T.M.'s face and body. SOF ¶ 22.

Next, the defendant drove JACKSON, CARNEY, and LANGLEY in her vehicle from T.M.'s residence to JONES' residence nearby. SOF ¶ 23. There, the defendant, JONES, CARNEY, LANGLEY, and JACKSON sat in the defendant's vehicle and played music on

4

JACKSON's cell phone. The defendant picked up JACKSON's phone to play music and saw the aforementioned text messages between JACKSON and T.M. SOF ¶ 24. Despite that the conversation occurred before T.M.'s beating, the defendant interpreted the text message as a sign of disrespect, and sent a screenshot of the message to CARNEY. SOF ¶ 24. At this point, the group decided to return to T.M.'s residence. SOF ¶ 25.

The defendant, CARNEY, JONES, LANGLEY, and JACKSON returned to T.M.'s residence in the defendant's vehicle. SOF ¶ 25. They walked to the front door, where they could hear T.M. speaking with her boyfriend. SOF ¶ 26. They knocked, and when T.M. opened the door, the defendant and LANGLEY started to beat T.M. SOF ¶ 26. JONES and CARNEY brandished their firearms and chased T.M.'s boyfriend upstairs, where the boyfriend locked himself in a bedroom and jumped out of a window to escape. SOF ¶ 26. After the boyfriend's escape, LANGLEY and the defendant, who was armed, walked T.M. to the defendant's car, while JONES and CARNEY also brandished their firearms. SOF ¶ 27.

The defendant began driving eastbound on Interstate-64. After approximately an hour of driving, the defendant and her codefendants stopped at a 7-Eleven in Newport News. SOF ¶ 30. While JONES and LANGLEY went into the store, the defendant told T.M. to suck CARNEY's penis, which CARNEY did not want. PSR ¶ 12. The defendant then forced T.M. to suck on the barrel of the defendant's firearm and pistol whipped T.M. in the face. SOF ¶ 30, PSR ¶ 12.

JONES and LANGLEY got back in the vehicle and the defendant started driving again. After some time, the defendant told the group to turn off their phones. PSR ¶ 12. The defendant then asked T.M. who she would sacrifice to save her own life, and T.M.'s response prompted JACKSON and LANGLEY to start beating her again. PSR ¶ 13.

5

The defendant stopped her vehicle in the roadway of Old Williamsburg Road in York County, Virginia, and the defendant and JONES had T.M. get out of the car and walk into the woods, where the defendant and JONES shot and killed her, firing at least fourteen shots and striking T.M. eight times in the head, abdomen, back, buttocks and legs.  SOF ¶ 31.

## THE VICTIM

At the time she was murdered, T.M. was twenty-five years old.  She was the mother of two minor children.  Her mother provided the Court with a more personal description of her daughter:

> [T.M.] was not just my daughter, she was my first true love.  She was my twin.  She was a vibrant soul, her smile could light up a room.  I struggled for months after her death to even look in the mirror because she looked so much like me.

In her victim impact statement, T.M.'s mother further described the devastating harm to T.M's family from the murder.

> My youngest daughter became distraught, started acting like [T.M.], she started running away, getting arrested, and I had to reach out to the courts for help.

> My children have lost their sense of safety and security in the community and with some family and friends.  My children have become overly protective of one another and are very cautious when it comes to anyone else.  They struggle with the feeling of grief, express it with anger and withdrawing from loved ones.  This crime has altered their perception of safety and hurt her [two] daughters who are only 5-6 years old have yet to fully understand [T.M.] is not coming back.

T.M. was murdered on May 6, 2023, in York County, but she was certainly not the only person harmed by this senseless crime.

## THE DEFENDANT'S BACKGROUND

The defendant is a twenty-seven-year-old female from Portsmouth, Virginia.  PSR at 2, ¶ 52.  The defendant's father was absent for most of her life and her mother was incarcerated for significant periods of time, so the defendant was raised by her grandmother.  PSR ¶ 52.  The defendant undoubtedly had a difficult childhood with absent parents, was the victim of sexual

6

abuse as a minor, and had a number of other difficulties as a teenager. PSR ¶ 52-53. The defendant began getting into trouble as a teenager, and was eventually placed in foster care when she was fifteen years old. PSR ¶ 54. The defendant ran away to Georgia when she was eighteen and later returned to live with her grandmother again. PSR ¶ 54.

The defendant was married twice and reported that she was abused by her second husband. PSR ¶ 57. She also reported being sexually assaulted while in Virginia in June 2020. PSR ¶ 65. The defendant has three children, and her youngest child's father is possibly CARNEY. PSR ¶ 59. The defendant gave birth to her youngest child while in custody on the instant offense. PSR ¶ 59. The defendant was also the victim of another rape in or about June 2020 in Orlando, Florida. PSR ¶ 65.

The defendant reported that overall, she is in good physical health. PSR ¶ 64. She reported having a significant history of mental health issues, including being diagnosed with anxiety, attention deficit hyperactivity disorder, and bipolar disorder since she was a juvenile. PSR ¶ 66. She was later also diagnosed with post-traumatic stress disorder, major depressive disorder, and adjustment disorder with mixed disturbance of emotions and conduct. PSR ¶ 67. The defendant had multiple suicide attempts between April and June 2024. PSR ¶ 67. The defendant is currently receiving treatment for her mental health. PSR ¶ 67. The defendant reported a history of substance abuse, using marijuana daily since she was twenty-four years old. PSR ¶ 68.

The defendant did not complete high school and was transferred to an alternative school program as a result of her disruptive behavior in school settings. PSR ¶ 69. She is currently working towards earning a high school diploma while incarcerated. PSR ¶ 69. Prior to her

incarceration, the defendant worked part time as a personal care assistant and as a cashier. PSR ¶¶ 72-73. She was also self employed as a stripper and sex worker. PSR ¶ 74.

The defendant's background and arrest reflect a history of perpetrating violence. Starting at age sixteen, the defendant was convicted of assaulting a law enforcement officer by striking a staff member at a juvenile facility in the head and threatening to kill her. PSR ¶ 31. In 2016 at the age of nineteen, the defendant was convicted of assault and battery (pled down from felony malicious wounding) of a family member for biting her mother and for throwing cleaning solution into her mother's eyes. PSR ¶ 32. In 2019, the defendant was convicted of assault and battery on another family member, her grandmother, for hitting her in the face and causing her to fall to her knees during an argument. PSR ¶ 33. In 2021, at age twenty-four, the defendant was convicted of using threatening language over the telephone for communicating death threats to her mother and her eight-year-old minor son. PSR ¶ 36. She was also convicted of six other non-violent offenses, including driving-related offenses, failure to appear, and contempt of court, which did not result in any criminal history points. PSR ¶¶ 34, 35, 37, 38, 39, 40.

Additionally, the defendant had significant encounters with law enforcement that did not result in convictions, including for multiple assault and battery charges on her family members. PSR ¶ 44-46, 48. Although a sentencing court may not consider a bare arrest record, a number of the charges reference specific (and similar) acts of assault from court and police records may be considered if determined reliable. U.S.S.G § 4A1.3(a)(2)(E); *United States v. Harris*, 702 F.3d 226, 229-231 (5th Cir. 2012). It does not appear that the defendant denies any of this conduct.

8

UNRESOLVED OBJECTIONS

The defendant maintains two objections to her PSR. First, defendant objects to paragraph 13 of the PSR, arguing that the information therein was unreliable. Second, defendant objects to the government's request for a two-level enhancement for physical restraint.

*Paragraph 13 of the PSR*

Defendant contends that the information in paragraph 13 should not be included in the PSR because it is not credible. This is wrong as a matter of law. "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661.

To the extent the defendant, in raising this objection, disputes facts set forth in the PSR, "[t]he defendant has an affirmative duty to make a showing that the information in the presentence report is unreliable, and [to] articulate the reasons why the facts contained therein are untrue or inaccurate." *See United States v. Terry*, 916 F.2d 157, 162 (4th Cir. 1990) (rejecting a defendant who "merely claimed" information was unreliable but never that "it was inaccurate or untrue," citing with approval the holding of *United States v. Mueller*, 902 F.2d 336, 346 (5th Cir. 1990) that a court can adopt a PSR's findings where the defendant failed to introduce evidence to rebut them). *See also United States v. Randall*, 171 F.3d 195, 211 (4th Cir. 1990) (upholding a drug quantity calculation based upon officer summaries of coconspirator statements that the defendant neither rebutted nor explained). Thus, where, as here, a government report supports a portion of the PSR, that report suffices and may be trusted if the defendant makes only unsupported attacks on it and fails to adduce "any evidence casting doubt" on its trustworthiness. *United States v. Fowler*, 58 F.4th 142, 151-53 (4th Cir. 2023) (quoting *United States v. Walker*, 922 F.3d 239, 253

9

(4th Cir. 2019). Without an affirmative showing that the PSR is inaccurate, the Court can "adopt the findings of the [PSR] without more specific inquiry or explanation." *Terry*, 916 F.2d at 162.

Finally, there was nothing untoward about the government fulfilling its obligation to interview a cooperating witness pursuant to an agreement entered into as part of her guilty plea. On the contrary, the United States was obliged to make good on that agreement. Pursuant to 18 U.S.C. § 3553(a), a sentencing court is able to consider a wide range of materials relevant to the defendant's offense and history, including statements of co-conspirators. The defendant's argument about reliability ultimately is a question of weight for the court to determine, rather than an issue of exclusion from the PSR. It is notable that the information in paragraph 13 was overwhelmingly consistent with other information developed to date in this case, which certainly counters the assertion by the defendant that none of it can be trusted.

*Restraint Enhancement*

Defendant next objects to the imposition of a two-level enhancement for physical restraint pursuant to Section 3A1.3 of the Guidelines, arguing that the facts of this case do not meet the definition for physical restraint and in the alternative, such an enhancement would constitute impermissible double counting.

Section 3A1.3 defines physical restraint as the forcible restraint of a victim, such as being tied, bound, or locked up. U.S.S.G. § 1B1.1, cmt. n.1(L). The definition's "use of words 'such as' [make it] apparent that 'being tied, bound or locked up' are listed by way of example rather than limitation." *United States v. Stokley*, 881 F.2d 114, 116 (4th Cir. 1989) (internal citation omitted). The Fourth Circuit Court of Appeals has repeatedly held that controlling someone's movement constitutes physical restraint. *See, e.g.*, *United States v. Johnson*, 492 F.3d 254, 257 (4th Cir. 2007) (defendant's act of gripping the victim's arms and holding her down while another

man raped her constituted forcible restraint); *United States v. Wilson*, 198 F.3d 467, 472 (4th Cir. 1999) (upholding finding of physical restraint where victim was held at gunpoint and was unable to leave her car while she was carjacked); *United States v. Baylor*, 296 F. App'x 360, 362 (4th Cir. 2008) (no error in applying physical restraint enhancement where a codefendant held a victim at gunpoint during a robbery).

The defendant admitted in the statement of facts to conduct constituting restraint. The defendant agreed that she conspired and joined together with her coconspirators to kidnap T.M. SOF ¶ 15. The defendant further agreed that she came to T.M.'s residence at approximately 2:28 a.m. and "kidnapped" T.M. SOF ¶ 25. If this were not enough, the defendant also agreed that she took T.M. by "force and against her will from her residence to the vehicle." SOF ¶ 27. The defendant also agreed that she and her coconspirators drove T.M. away from her residence "for the purpose of holding T.M. under force and against her will." SOF ¶ 29. Finally, the defendant and JONES directed T.M. to walk into the woods off Old Williamsburg Road where she was later murdered. SOF ¶ 30. When a defendant disputes facts to which he agreed, the court is entitled to rely on the defendant's prior sworn admissions to establish the truth of those facts. *See United States v. Lemaster*, 403 F.3d 216, 221-22 (4th Cir. 2005) ("[I]n the absence of extraordinary circumstances, the truth of sworn statements made during a Rule 11 colloquy is conclusively established…."); *United States v. Bowman*, 348 F.3d 408, 417 (2003) ("[A]n appropriately conducted Rule 11 colloquy can only serve meaningfully if the court is entitle to rely on the defendant's statements made under oath to accept a guilty plea.").

While some other circuits apply this enhancement more narrowly, "in this Circuit the law is clear that use of a gun to restrain a victim may constitute physical restraint within the meaning of § 2B3.1." *Baylor*, 296 F. App'x at 362. Notably, this enhancement was recently applied in

JONES' separate Hobbs Act robbery conviction,[2] during which JONES held a security guard at gunpoint and required the security guard to remain seated and raise his hands in the air. *See United States v. Jones*, No. 4:23-cr-90 (RAJ), ECF No. 20. The facts underlying this case are more compelling, as the defendant abducted T.M., forced her to walk to the vehicle against her will, transported her in that vehicle for over an hour, and forced her to walk into a forest where she was then murdered.

Moreover, application of the physical restraint enhancement does not amount to double counting in this case, as the defendant's offense does not include an element of physical restraint. U.S.S.G. § 3A1.3 cmt. n.2 provides that this enhancement does not apply where "the offense guideline specifically incorporates this factor or where the unlawful restraint of a victim is an element of the offense itself," such as in kidnapping or abduction cases. The defendant has pled guilty to using a firearm during and in relation to a murder in aid of racketeering. Unlike kidnapping and abduction offenses, this conviction does not hinge on whether the defendant's use of a firearm during and in relation to the murder occurred while the victim was restrained.

This case is similarly distinguishable from *United States v. Mikalajunas*, 936 F.2d 153, 157 (4th Cir. 1991), in which the Court held that a second-degree murder by stabbing did not warrant the physical restraint enhancement because "[e]very murder involves the ultimate restraint." The Court noted that the enhancement is intended "to be made in the context of an act which adds to the basic crime." *Id.* Here, the defendant's actions of abducting the victim into her vehicle and directing her movement amounted to forcible restraint, not the murder itself. Therefore, the enhancement should be applied.

---

[2] While the physical restraint enhancement for robbery is located under a different section of the Guidelines, U.S.S.G. § 2B3.1(4)(B), the definition is cross-referenced in Section 1B1.1, the same as for the instant offense. *See* U.S.S.G. § 2B3.1, cmt. n.1.

12

## POSITION ON SENTENCING AND ARGUMENT

The United States respectfully submits that a sentence of 45 years of imprisonment is appropriate in light of all of the sentencing factors set forth in 18 U.S.C. § 3553(a) and would be sufficient but not greater than necessary to accomplish the goals of sentencing.

*First*, the nature and circumstances of this offense are some of the most severe that can occur in the federal criminal system. The defendant shot and killed T.M., a twenty-five-year-old mother of two young children. Not only did the defendant take a human life, she beat and taunted T.M. in the hours leading up to her death. After beating the victim the first time, the defendant and her codefendants chose to return to T.M.'s residence and escalate their violence over what can only be described as extremely trivial perceived disrespect. Upon their return, they created such an environment of fear that T.M.'s boyfriend jumped out of a second-floor window to escape the group.

Amongst her codefendants, the defendant played a particularly egregious role in the kidnapping and murder. While the defendant was under the leadership of CARNEY, she appeared to have played a significant part in re-energizing her codefendants to return to T.M's home after the initial beating. She was further in control of her vehicle, ostensibly choosing the remote destination in Yorktown with the intent of murdering T.M. This was not a heat of the moment decision, as the defendant drove over fifty miles from Richmond to the scene of the murder, with a stop along the way in Newport News. During that stop, rather than make any attempt to de-escalate the situation, the defendant chose to further humiliate and brutalize T.M. by attempting to sodomize her and pistol whipping her in the face.

As the defendant approached the area of Old Williamsburg Road, she told her codefendants to turn off their phones, indicating her ability to think clearly enough in that moment to try to evade

13

any law enforcement detection of the murder she was about to commit. Finally, during the last moments of T.M.'s life, the defendant and JONES ordered her to walk into the wood line, where they shot and killed her. They did not shoot to warn or wound T.M.—they fired at least fourteen shots, ensuring that T.M. was dead.

Moreover, the defendant committed this offense as a member of BPSN, a violent criminal gang. She admitted to killing T.M. as part of maintaining and increasing her position in that enterprise—one which was already a position of leadership as the "First Lady" of her region. The involvement of a gang in this offense heightens its severity, as the defendant contributed to creating pervasive fear in her community. BPSN is also no minor criminal enterprise; rather, it is one that has promoted murder, robbery, drug trafficking, and other violent offenses. Here, the defendant's choice to take part in the gang life has left a family without a mother, daughter, and granddaughter. Federal law recognizes violent crimes committed on behalf of a criminal enterprise warrant greater punishment, and that should be reflected in the defendant's sentence. *See* 18 U.S.C. § 1959.

*Second*, while the defendant's difficult upbringing is certainly mitigating, it does not outweigh her history of violence. As is often the situation in gang cases, the PSR describes an extraordinarily challenging childhood for the defendant, including the absence of her parents, sexual assault by a family member, and her eventual placement in foster care. She is also a mother to three children, including a child she gave birth to while in custody. However, all of that must be balanced against the defendant's choice to deprive T.M.'s children of their mother, a choice that will negatively impact them for the rest of their lives.

Additionally, the defendant's murder of T.M. cannot be viewed in a vacuum. It must be evaluated in the context of her escalating acts of violence throughout her young adulthood and membership in BPSN. Her criminal history reflects years of assaults against members of her

14

family and the public. The PSR details incidents of the defendant throwing cleaning solution into her mother's eyes, hitting her grandmother in the face and causing her to fall to her knees, and threatening to kill her mother. While her multiple traffic offenses do not rise to the same level of severity, they additionally reflect a general disregard for the rule of law. The defendant also had seven arrests that did not result in convictions for other offenses, including violent ones, showing that she has been given many chances to change her behavior that were taken in vain.

As a member of BPSN, the defendant has committed at least one other violent assault prior to the murder that the government is aware of, participating in the beating of another gang member, which resulted in serious physical injury. *See* PSR ¶ 12. Rather than learn from this experience and renounce her membership in the gang, she continued her participation and escalated to committing a murder. For these reasons, the defendant's history and characteristics further support a sentence of 45 years of imprisonment.

*Third* and finally, general deterrence, the seriousness of the offense, promoting respect for the law, providing just punishment, and public safety all support a sentence of 45 years. The public must look at the actions of the defendant and know that these offenses will be not tolerated. Considering the dangerous nature of the defendant's crimes, a sentence at the height of the range the Court may consider is long enough to ensure meaningful deterrence and respect for the law, and serve as a warning to others considering membership in an enterprise like the BPSN of the consequences that may follow.

## CONCLUSION

The defendant took the life of T.M. She did so deliberately and without regard for the impact on not just T.M. but also her family and the community. The circumstances of the murder were egregious, involved gangs, taunting, sexual abuse, and repeated acts of violence. A

significant sentence is necessary to account for the seriousness of the crime of conviction. For the foregoing reasons, the United States respectfully requests that this Court impose a sentence of 45 years of imprisonment, which is sufficient but not greater to accomplish the goals of sentencing.

Respectfully submitted,

JESSICA D. ABER
UNITED STATES ATTORNEY

By:      /s/
Lisa R. McKeel
Assistant United States Attorney
Virginia Bar No. 28652
One City Center
11815 Fountain Way, Suite 200
Newport News, Virginia 23606
(757) 591-4000 Office
(757) 591-0866 Fax
Lisa.McKeel@usdoj.gov

By:      /s/
D. Mack Coleman
Assistant United States Attorney
One City Center
11815 Fountain Way, Suite 200
Newport News, Virginia 23606
(757) 591-4000 Office
(757) 591-0866 Fax
Mack.Coleman@usdoj.gov

By:      /s/
Alyssa Levey-Weinstein
Special Assistant United States Attorney
One City Center
11815 Fountain Way, Suite 200
Newport News, Virginia 23606
(757) 591-4000 Office
(757) 591-0866 Fax
Alyssa.Levey-Weinstein@usdoj.gov

CERTIFICATE OF SERVICE

      I certify that on December 27, 2024, I electronically filed a copy of the foregoing with the Clerk of the Court using the CM/ECF system who will send notification of such filing (NEF) to all counsel of record.

      By:    /s/
      Alyssa Levey-Weinstein
      Special Assistant United States Attorney
      United States Attorney's Office
      Fountain Plaza Three, Suite 300
      721 Lake Front Commons
      Newport News, Virginia 23606
      (757) 591-4000 Office
      (757) 591-0866 Fax
      Alyssa.Levey-Weinstein@usdoj.gov